# United States District Court

FOR THE

**NORTHERN DISTRICT OF CALIFORNIA**

VENUE: SAN FRANCISCO

CR25-00126 CRB

UNITED STATES OF AMERICA,

V.

KENNETH W. MATTSON,

**FILED**

May 13 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

DEFENDANT(S).

## INDICTMENT

Counts 1-7: 18 U.S.C. § 1343 – Wire Fraud
Count 8: 18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (Money Laundering)
Count 9: 18 U.S.C. § 1519 – Destruction/Alteration of Records in a Federal Investigation (Obstruction of Justice)
18 U.S.C. §§ 981, 982; 28 U.S.C. § 2461(c) – Forfeiture

A true bill.

*/s/ Foreperson of the Grand Jury*

Foreman

Filed in open court this \_\_\_13th\_\_\_ day of

\_\_May, 2025_____ .

S. Ybarra

Clerk

Bail, $ Warrant

Hon. Alex G. Tse, U.S. Magistrate Judge

```
                                                              FILED
                                                              May 13 2025
                                                              Mark B. Busby
                                                          CLERK, U.S. DISTRICT COURT
                                                         NORTHERN DISTRICT OF CALIFORNIA
                                                                SAN FRANCISCO
```

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) CASE NO. CR25-00126 CRB |
|---|---|
| Plaintiff, | ) |
| | ) VIOLATIONS: |
| v. | ) 18 U.S.C. § 1343 – Wire Fraud; |
| | ) 18 U.S.C. § 1957 – Engaging in Monetary |
| KENNETH W. MATTSON, | ) Transactions in Property Derived from Specified |
| | ) Unlawful Activity (Money Laundering); |
| Defendant. | ) 18 U.S.C. § 1519 – Destruction/Alteration of Records |
| | ) in a Federal Investigation (Obstruction of Justice); |
| | ) 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1) and (b)(1) and |
| | ) 28 U.S.C. § 2461(c) – Forfeiture Allegation |
| | ) |
| | ) SAN FRANCISCO VENUE |
| | ) |
| | ) UNDER SEAL |
| | ) |

# INDICTMENT

The Grand Jury charges:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.      For more than a decade, defendant KENNETH W. MATTSON orchestrated and operated a scheme whereby he fraudulently solicited and obtained millions of dollars in investments from hundreds of investors—many of whom were nearing or in retirement—in what he represented were legitimate and safe interests in limited partnerships that owned real estate. Although MATTSON was a

INDICTMENT

part-owner of a company that formed and managed partnerships that owned real estate, the victim investor funds did not go to that company or to the partnerships managed by that company. Instead, MATTSON siphoned those victim investor funds into a scheme in which the investors had no legal interest in the properties in which they believed they were investing, and any distributions they received were in part funded by money from new investors—a Ponzi scheme. The scheme collapsed when MATTSON was no longer able to raise new investor money to pay existing investors.

2. Through oral and written false statements, misrepresentations, half-truths, and omissions, MATTSON falsely represented to these victims that their investments gave them partnership interests and corresponding legal rights in certain real estate-holding limited partnerships (LPs) managed by LeFever Mattson, a California Corporation (LM). In fact, MATTSON never intended to make those victims true and legal partners in the LM LPs. Instead of using the victims' funds to buy an ownership interest in the LM LPs, as he represented, MATTSON used victim money for personal expenses, to purchase and fund properties held in the name of his personal real estate holding entity, and to make payments to existing investors. Instead of communicating to LM that the investors had purchased interests in LM LPs and ensuring that the investors were recorded as official owners of the LM LPs, MATTSON concealed the existence of the investors and their investments from LM. In doing so, MATTSON breached his fiduciary duty to LM and the partners of the LM LPs.

3. To perpetuate the scheme and ensure that victim investors and officers and employees of LM and a related entity that kept LM's official books and records did not discover the fraud, MATTSON manufactured records he knew were false and falsely represented to investors that LM managed their partnership stakes. He also utilized a bank account in the name of LM to issue checks to victim investors, issued and caused paperwork to be issued in the name of LM and LM LPs purporting to reflect the value of the purported investments, and provided fictitious tax forms to investors that falsely reflected LP ownership interests and other material information. All of these were false statements designed to make investors believe they had invested in and owned legitimate shares of real LM-managed LPs and to induce future investments with MATTSON.

4. MATTSON also laundered money by using proceeds of the scheme—specifically victim investments—to fund personal expenditures and real estate ventures that benefitted himself, not victim

INDICTMENT                                                          2

1 investors.

5. MATTSON also engaged in similar fraudulent conduct through another real-estate holding entity over which he exercised sole business control—KS Mattson Partners, LP (KSMP).

6. After MATTSON learned that federal authorities were investigating his scheme, and two days before the execution of a federal search warrant at his residence in Sonoma, California, MATTSON obstructed justice by, among other things, deleting from his personal computer thousands of documents related to the scheme and victim investors.

## RELEVANT INDIVIDUALS AND ENTITIES

7. Defendant KENNETH W. MATTSON resided in Sonoma County and Alameda County in the Northern District of California. MATTSON was previously a registered financial advisor and broker. He was also a tax preparer who possessed an Internal Revenue Service (IRS) Preparer Tax Identification Number (PTIN), which he used to prepare and submit federal tax returns.

8. LM was a California corporation with its principal place of business in Citrus Heights, California. MATTSON was the President of LM and owned 50 percent of its shares. LM, and related and subsidiary entities owned and/or controlled by LM, owned and managed commercial and residential properties, including in the Northern District of California.

9. MATTSON, as President of LM, had primary responsibility for soliciting investments for LM projects and finding and acquiring real estate for LM LPs.

10. Home Tax Service of America, Inc. d/b/a LeFever Mattson Property Management (Home Tax), majority-owned by LM, acted as the property manager for properties owned by LM and LM-managed LPs. Home Tax's duties included collecting rents, property maintenance, and paying distributions owed to limited partners in LM LPs. Home Tax also acted as the official keeper of books and records for LM LPs and other entities over which it exercised control. In that role, Home Tax tracked and updated information about those limited partnerships and other entities, including names and contact information of the initial limited partners, changes in ownership, and monthly distributions owed to record limited partners. Home Tax also submitted IRS Form 1065 partnership returns for the LM LPs and provided K-1 partnership distribution forms to record limited partners of the LM LPs.

11. Divi Divi Tree, LP (Divi Divi) was a California limited partnership. Divi Divi was

INDICTMENT                    3

formed in 2002.  Divi Divi was formed to acquire and maintain a large multi-unit apartment community called the "Sienna Pointe Apartments."  Divi Divi had approximately 19 original investors and limited partners, who contributed more than $10,000,000 in initial capital.  LM was the General Partner.  Over time, LM, KSMP, and others purchased the interests of other investors, such that by December 2023, the official books and records maintained by Home Tax reflected only four partners with interests in Divi Divi.

12. Heacock Park Apartments, LP (Heacock Park) was a California limited partnership that was formed in 2013 to acquire and maintain a large multi-unit apartment community called the "Heacock Park Apartments."  Heacock Park initially had 19 investors who contributed nearly $3,500,000 in initial capital.  LM was the General Partner.

13. LENDING ENTITY 1 was a hard money lender headquartered in Sacramento, California.  LENDING ENTITY 1 described itself as a premier private lender with over 2,000 loan transactions totaling over $2 billion worth of loans.  Between 2011 and 2024, LENDING ENTITY 1 provided more than $180,000,000 in loans to KSMP for various properties across California.

## THE SCHEME TO DEFRAUD

14. Beginning at a time unknown but no later than in or about May 2009, and continuing through in or about May 2024, MATTSON, knowingly and with the intent to defraud, participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, half-truths, and promises, and by means of omission and concealment of material facts.

15. As part of the scheme to defraud, MATTSON offered and sold to investors what he stated were interests in LM partnerships, promising regular returns in the form of rent distributions and the security of being a partner in an entity that owned valuable real estate.  In fact, MATTSON kept these investments "off books"—that is, MATTSON kept these investments secret from LM, Home Tax, other owners and principals, and the record limited partners of the LM LPs.  MATTSON deceived investors into believing they were, through their investment and the signing of false agreements, becoming true limited partners in LM LPs, with certain legally enforceable rights and privileges, access to regular monthly distributions derived from rents on the properties, and the ability to withdraw their principal on

INDICTMENT                                                       4

request. In fact, MATTSON knew these investors never actually acquired interests in those LM LPs. MATTSON concealed these "off-books" transactions from LM and Home Tax. In doing so, MATTSON breached the fiduciary duties he owed to LM, Home Tax, other owners and principals, and to the record limited partners in the LM LPs. In addition, MATTSON owed a duty of candor and loyalty to the "off-books" investors based on MATTSON's control of the information that investors would need to make an informed investment choice, and his representations to them that he was an authorized representative of the general partner of the LPs at issue. He also breached these duties, and omitted material information from investors to obtain their investments.

16. MATTSON executed the fraud scheme through a web of false representations and material omissions to these "off-books" investors, which included (1) falsely identifying the entity in which they were investing, (2) falsely representing that they had purchased a specific percentage of an LM LP that owned identified real estate, (3) creating and providing false documents that indicated "off-books" investors had certain legally enforceable rights and privileges that were significant to the decision to invest, (4) false statements about the security of the investments, and (5) falsely representing that the investment would generate distributions from rents of the underlying real property assets.

### "Off-Books" Divi Divi Tree LP Investors

17. As part of the scheme, MATTSON persuaded investors to roll over funds from their existing tax-advantaged retirement accounts to MATTSON-controlled "self-directed" individual retirement accounts (IRAs) managed by various third-party custodians.

18. MATTSON represented to these individuals that by rolling over their retirement funds, they were purchasing ownership interests in Divi Divi. These representations were false.

19. MATTSON also represented to these investors that their investments would earn approximately six percent returns every year and they could withdraw their principal investment at any time.

20. Between 2019 and 2024, MATTSON obtained at least $24,000,000 from at least 75 victims by falsely promising them that they were purchasing interests in Divi Divi. MATTSON did not disclose the existence of these "investors" to LM or Home Tax.

21. To assure investors that their money was safe, and throughout the course of the scheme,

INDICTMENT                           5

MATTSON caused third-party IRA custodians to generate and provide to the "off-books" investors false and fraudulent statements reflecting that the value of their purported investments increased annually.

22. MATTSON, a sophisticated finance expert and registered tax preparer, knew that because IRAs and similar tax-advantaged retirement accounts grow tax-free, Divi Divi investors were unlikely to withdraw their principal investments or demand regular distribution payments. Rather, owing to retirement accounts' tax-advantaged status, those investors were likely to only withdraw the "required minimum distribution" (RMD) after they reached the age provided by law. MATTSON knew that this made his scheme more difficult to detect and delayed his payment obligations.

23. Some investors—including those of retirement age—who sought their distributions (or in the rare case, principal withdrawals) from their purported investments received payments from MATTSON. Between 2019 and 2024, MATTSON wired or caused to be wired more than $10,000,000 to a third-party IRA custodian for distributions, fees, minimum account balances, and other payments related to "off-books" Divi Divi investors. But those wires were not funded by rents or other profits generated by any Divi Divi assets. Rather, they were funded by co-mingled funds controlled by MATTSON and by purported investments from new victims MATTSON recruited into the scheme.

24. In order to conceal the scheme, MATTSON caused to be created false and fraudulent IRS Forms 5498 reflecting the fictitious fair market value of the victims' purported ownership interests and false and fraudulent IRS Forms 1099-R reporting distributions from the "off-books" Divi Divi investments. MATTSON provided these tax forms to investors.

<u>MATTSON's Misrepresentations to Divi Divi "Off-Books" Investors</u>

25. D.R. and K.R. were unwitting "off-books" investors in Divi Divi who invested more than $3 million with MATTSON between 2007 and 2022, including at least $1.74 million in Divi Divi. In 2009, D.R. and K.R. invested more than $200,000 with MATTSON by transferring funds from their retirement accounts to a third-party custodian controlled by MATTSON at MATTSON's direction. On or about May 22, 2009, MATTSON provided D.R. with an "Agreement of Limited Partnership of Divi Divi Tree, L.P.," which purported to give D.R. a percentage ownership in Divi Divi. In or about October 2022, at MATTSON's urging, D.R. rolled over another $1.54 million in retirement funds into what MATTSON represented to be an additional investment in Divi Divi.

INDICTMENT                                                    6

26. K.B. was also an unwitting "off-books" investor in Divi Divi who invested approximately $1.5 million with MATTSON. K.B. began investing with MATTSON in 2006. K.B. invested $500,000 in Divi Divi by rolling over funds from his existing retirement accounts—$200,000 in 2012 and $300,000 in 2022.

27. MATTSON made material false statements, misrepresentations, half-truths and omissions to induce victims to unknowingly invest in the "off-books" Divi Divi scheme. These included, but were not limited to the following:

 a) MATTSON misrepresented to "off-books" Divi Divi investors that they were purchasing from LM a "percent ownership" and legitimate interest in Divi Divi; MATTSON, in fact, never communicated to LM or to Home Tax—which kept the official books and records for Divi Divi—that he had sold "off-books" shares in Divi Divi. MATTSON represented to investors that he was acting on behalf of LM and selling a portion of LM's ownership in Divi Divi to them. This was false. By hiding his sale of "off-books" Divi Divi investments that were not recorded on LM or Divi Divi's books and records, MATTSON concealed his lack of authority to engage in the transactions and breached his fiduciary duty to LM and Divi Divi's record limited partners;

 b) MATTSON provided written documents to memorialize the purported sale of these fictitious limited partnerships, such as the actual 2002 "Agreement of Limited Partnership for Divi Divi Tree L.P.;" these Agreements contained false statements as to the "off-books" investors, including misstating the off-books investors' legal rights and privileges since the investors never became limited partners in Divi Divi;

 c) MATTSON provided false tax documents to the "off-books" investors related to their purported Divi Divi investment;

 d) MATTSON misrepresented the underlying asset and financial soundness of the purported Divi Divi investment. MATTSON misrepresented to investors that Divi Divi's primary asset was the Sienna Pointe Apartments in Riverside County, a multi-unit apartment community that generated monthly rental income. Prior to August 2021, Divi Divi owned that asset and record investors received distributions from its rental income. But the "off-books"

INDICTMENT         7

investors never had any right to receive rent from the Sienna Pointe Apartments and could not receive such rents because they were unknown to LM;

  e)  MATTSON concealed the 2021 sale of the Sienna Pointe Apartments from existing and subsequent "off-books" Divi Divi investors.  MATTSON and LM caused the Sienna Pointe Apartments, the property underlying Divi Divi, to be sold in August 2021 for $86,513,600, resulting in net proceeds of $33,625,829.  Notwithstanding MATTSON's prior representations to "off-books" investors that they would be notified upon sale and be entitled to share in profits proportionate to their ownership stake, MATTSON concealed the existence of the sale from existing "off-books" Divi Divi investors and omitted that the primary asset of Divi Divi had, in fact, been sold when recruiting new investments for Divi Divi;

  f)  MATTSON misrepresented the safety and security of the victims' purported investments by representing that their distribution flowed from rents secured by an income-generating, LM-backed asset when in fact, the distributions were funded in part by monies from new investors, including later investors, in the manner of a Ponzi scheme;

  g)  MATTSON made misrepresentations to the "off-books" Divi Divi investors about their ability to share in the profits from the sale of the underlying Divi Divi asset and to withdraw their principal investment at any time, subject to a 60-to-90 day waiting period;

  h)  MATTSON omitted information material to the "off-books" investors' decision to invest in Divi Divi.  For example, MATTSON omitted and failed to disclose, in violation of his duty of candor, that he was selling "off-books" investments that were untethered and unknown to LM, that he was doing so without legal authorization, and that "off-books" investors were investing personally with MATTSON, who omitted the true financial condition of the entities into which they were investing.  MATTSON concealed and failed to disclose that the "off-books" Divi Divi investors were not actually investing in a LM LP, but instead in a MATTSON-controlled Ponzi scheme.

28.  "Off-Books" Divi Divi investors, including D.R. and K.B., invested in Divi Divi based on MATTSON's material false statements, misrepresentations, half-truths and omissions.

### "Off-Books" Heacock Park Apartments LP Investors

29. MATTSON also recruited investors to invest directly in purported LM limited partnerships such as Heacock Park. Between approximately 2019 and approximately April 2024, MATTSON sold at least $4,000,000 in purported partnership interests in Heacock Park to at least 26 "off-books" investors. None of the "off-books" Heacock Park investments appear on any of the LM books and records maintained by Home Tax, or in the tax filings MATTSON caused to be filed on behalf of LM and Heacock Park. In fact, MATTSON provided some of these "off-books" investors with false IRS Form K-1s. Between 2019 and 2024, MATTSON paid at least $1.4 million in distributions to these "off-books" investors. MATTSON convinced many of these "off-books" investors to enter into an "Agreement of Transfer and Purchase of Partnership Interest," ostensibly between LM and the investor, in exchange for a direct payment, usually in the form of a personal check.

### MATTSON's Misrepresentations to Heacock Park "Off-Books" Investors

30. K.A. and her spouse, R.A., are longtime residents of Sonoma County, in the Northern District of California, who were introduced to MATTSON through neighbors who had previously invested with MATTSON.

31. In 2017, MATTSON promised K.A. and R.A. that a $500,000 investment with him would ensure $2,500 per month for the rest of the life of their special-needs dependent. They started investing with MATTSON in February 2018, and by August 2022, had invested $350,000 with MATTSON across four purported LM LPs. MATTSON guaranteed a six percent annual return, described the property that was subject to the investment, and promised that they would be notified if the property sold and that they would be paid their fair share of profit from any sale.

32. On September 23, 2020, K.A. and R.A. met with MATTSON. Based on MATTSON's promises, they signed a Transfer and Purchase of Partnership Interest that purported to grant them a 0.611 percent partnership interest in Heacock Park and gave MATTSON a check for $100,000.

33. In August 2022, K.A. asked MATTSON if it was too late for her to make an additional investment in Heacock Park since she understood the underlying asset was to be sold soon. MATTSON assured her that it was not too late.

34. On August 11, 2022, K.A. and R.A. met with MATTSON at a MATTSON-owned deli in

INDICTMENT                     9

Sonoma. MATTSON again made the same promises he made in 2020 regarding Heacock Park. As a result of these representations, K.A. and R.A. gave MATTSON a check for another $50,000 for a purported additional investment in Heacock Park. During this meeting, MATTSON concealed the fact that LM had sold the apartment building underlying Heacock Park in 2021. In fact, MATTSON never notified K.A. or R.A. that the underlying asset had sold, despite his September 2020 promises that he would notify K.A. and R.A. of any sale and provide them an opportunity to share in profits from the sale of the apartments at that time.

35.     MATTSON made the following material misrepresentations and omissions to victim investors to induce "off-books" investments in Heacock Park:

   a) MATTSON misrepresented to "off-books" Heacock Park investors that they were purchasing from LM a "percent ownership" and legitimate limited partnership interest in Heacock Park from LM; MATTSON, in fact, never communicated to LM or to Home Tax—which kept the official books and records for Heacock Park—that he had sold "off-books" shares in Heacock Park. MATTSON misrepresented to investors that he was acting on behalf of LM and selling a portion of LM's ownership in Heacock Park to them. By hiding his sale of "off-books" Heacock Park investments that were not recorded on LM or Heacock Park's books and records, MATTSON concealed his lack of authority to engage in the transactions and breached his fiduciary duty to LM and Heacock Park's record limited partners;

   b) MATTSON provided agreements titled "Agreement of Transfer and Purchase of Partnership Agreement" containing false statements, including statements purporting to transfer a percentage ownership interest in Heacock Park from LM to the "off-book" investor. The agreement also provided the "off-books" Heacock Park investor would become a limited partner and would receive all the corresponding rights and benefits;

   c) MATTSON concealed the "off-books" Heacock Park investors and their purported percentage ownership investments from LM and Home Tax, which kept the official books and records for Heacock Park. As a result, the "off-books" investors were never recorded in the LM ownership records for Heacock Park, the software that tracked and processed official distributions, or the tax reporting for Heacock Park.

INDICTMENT                              10

       d)       Yet, MATTSON provided false statements to "off-books" Heacock Park investors in the form of fictitious tax forms that depicted the "off-books" investors as true "limited partners" in Heacock Park. In at least some instances, these forms included a beginning capital account balance, and a record of "withdrawals and contributions" that corresponded to the "off-book" distribution payments MATTSON made during the calendar year. But the actual Heacock Park Form 1065 tax returns for these years which were filed under MATTSON's supervision do not reflect the "off-books" investors as limited partners;

       e)       MATTSON told "off-books" investors prior to their Heacock Park investment that the distributions they were to receive on their investment came from the rents paid by tenants in the apartments. But because the "off-books" investors were not record investors or owners in Heacock Park, their "distributions" from MATTSON were not from underlying rental income. Rather, their distributions were financed by the payments of other investors, including later investors, in the manner of a Ponzi scheme;

       f)       MATTSON concealed the 2021 sale of the Heacock Park Apartments from the "off-books" investors. MATTSON and LM caused the apartment building asset underlying Heacock Park to be sold in August 2021 for $20,731,418, resulting in net proceeds of $8,440,189. Notwithstanding MATTSON's prior representations to "off-books" investors that they would be notified upon sale and be entitled to share in profits proportionate to their ownership stake, MATTSON concealed the existence of the sale from existing "off-books" Heacock Park investors and omitted that the primary asset of Heacock Park had, in fact, been sold when recruiting new investments for Heacock Park; and

       g)       MATTSON omitted information material to the "off-books" investors' decision to invest in Heacock Park. MATTSON omitted and failed to disclose, in violation of his duty of candor, that he was selling "off-books" investments that were untethered and unknown to LM, that he was doing so without legal authorization, and that such investors were investing personally with MATTSON, with MATTSON omitting the true financial condition of the entities into which they were investing. MATTSON concealed and failed to disclose that the "off-books" Heacock Park investors were not actually investing in an LM LP, but instead in a

INDICTMENT                             11

MATTSON-controlled Ponzi scheme.

36. "Off-books" Heacock Park investors, including R.A. and K.A., invested in Heacock Park based on MATTSON's material, false statements, misrepresentations, half-truths and omissions.

## MANNER AND MEANS

37. In furtherance of the scheme to defraud, MATTSON used a variety of means and methods, including by making materially false and fraudulent pretenses, representations, half-truths and promises, as well as omissions and concealment of material facts to induce investments from "off-books" investors, including but not limited to the following:

a. misrepresenting the party with whom they were investing (MATTSON personally as opposed to LM);

b. concealing that their "off-books" investments would not be recorded in LM's official books and records as true investors, thus depriving the "off-books" investors of the legal rights and privileges of true limited partners;

c. misrepresenting the nature of their investments by stating they were buying a percentage of certain LM limited partnerships, invested in specific real property,

d. misrepresenting the property in which they were invested (since they were never recognized as actual limited partners in the official LM books and records);

e. misrepresenting that they would be notified upon sale of the properties underlying the LPs and enjoy profit sharing in proportion to their ownership interest upon sale, as well the return of their initial investment;

f. misrepresenting the overall safety and security of the investments (*e.g.* that the investors could withdraw their principal at any time);

g. making false statements, and omitting true facts that MATTSON had a duty to disclose, regarding the fair market value of the properties in which investors believed they were partners and in which their money had been invested;

h. misrepresenting distribution payments to "off-books" investors as returns generated from rent of the underlying assets, but which were, in fact, payments made possible only by MATTSON's ability to recruit new investors to infuse his low-balance accounts, and the

INDICTMENT                                             12

|   |   |   |
|---|---|---|
| | | sale of unrelated properties and loans, including from LENDING ENTITY 1; |
| | i. | misrepresenting the nature of the investment on the distribution checks by noting they were "owner withdrawals" from the purported LM; |
| | j. | utilizing these distributions to perpetuate the ongoing scheme, dampen investor suspicion, and prevent detection; |
| | k. | making false statements by providing false tax documentation such as fair market value reports and IRS Forms K-1 to create the impression that "off-books" investors were deriving legitimate partnership distributions; |
| | l. | using a personally controlled checking account in the name of LM but corresponding to a P.O. Box controlled solely by MATTSON; and |
| | m. | concealing and failing to disclose that the "off-books" investors were investing in a MATTSON-controlled Ponzi scheme, and one which was not financially viable and in fact progressively teetered on insolvency absent new investor monies. |

38. In addition, from a time unknown but no later than January 1, 2019, MATTSON knew that MATTSON's own share of rents and revenue from LM owned and managed properties was insufficient to meet obligations to pay interest payments and distributions to existing "off-books" investors for Divi Divi and Heacock Park.

39. MATTSON also knew that new investor funds would be required to continue to pay interest payments and distributions owed to previous investors.

40. In a bank account which MATTSON maintained in the name of LM with an account number ending in 1059 (the 1059 Account), MATTSON co-mingled funds, including investor money, with money from at least two other accounts: one that he held in the name of KSMP and a third account he controlled. For example, MATTSON transferred funds between the accounts and used the 1059 Account to pay for millions of dollars of personal expenses, such as mortgages on homes owned by KSMP in Piedmont, California and Del Mar, California. Between 2019 and 2024, the 1059 Account had declining cash balances on January 1 of each year, such that without new investments, the 1059 Account would have had a cumulative net negative balance of approximately $26,000,000. Between 2019 and 2024, these three accounts alone had total debits of approximately $346,000,000 and total credits of

INDICTMENT                                                    13

$341,000,000, resulting in net activity of nearly negative $5,000,000.

41. MATTSON, however, made false representations and concealed material facts by telling investors that the purported LM investment opportunities he offered were profitable, and that the asset value and cash flow were sufficient to repay the distributions and cash out investors upon request. To assure investors that their investments were safe and sound, MATTSON touted the fact that he had investors waiting to buy in, that the investments were backed by LM, that investors would share in the profits upon sale, and that investors could withdraw their principal amount at any time. In fact, as MATTSON knew, in order to make continued payments of distributions and interest and to repay investors who sought withdrawals, MATTSON needed to continue to collect new investor funds, obtain loans, and sell properties. Contrary to his representations about the use of funds, MATTSON used new investor funds to pay interest and distributions owed to previous investors in the scheme.

42. Throughout the scheme, under California law, Home Tax, as the manager for the general partner of the LM LPs, was required to maintain a dedicated trust bank account for the deposit of rents from the properties and the distributions to limited partners. MATTSON knew that to the extent he was paying money to the "off-books" investors as false distributions of rents, these amounts were not being paid from a trust bank account. By promising distributions to victim investors from their ownership interests in the partnerships, and by making payments that appeared to be such distributions, MATTSON used false representations, promises and pretenses regarding the nature of the investments. MATTSON also, while he had a duty to disclose, failed to tell investors that he was violating or circumventing the law and failed to tell investors that any distributions to investors were not derived from rents, trust accounts, or proceeds from the sale of properties, and were in fact from money MATTSON obtained from new investors or other sources not associated with the LM LPs.

43. Between 2019 and 2024, MATTSON obtained at least $28 million from investors for "off-books" investments in Divi Divi and Heacock Park alone.

COUNTS ONE THROUGH SEVEN:     (18 U.S.C. § 1343 – Wire Fraud)

44. Paragraphs 1 through 43 of this Indictment are re-alleged and incorporated as if fully set forth herein.

INDICTMENT                14

45. Beginning on a date unknown to the Grand Jury, but no later than in or about May 2009, and continuing through in or about May 2024, in the Northern District of California and elsewhere, the defendant,

KENNETH W. MATTSON,

knowingly and with the intent to defraud, participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, half-truths, and promises, and by means of omission and concealment of material facts.

### Execution of the Scheme

46. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant,

KENNETH W. MATTSON,

did knowingly transmit and cause to be transmitted, in interstate and foreign commerce, by means of a wire communication, certain writings, signs, signals, pictures, and sounds, specifically, the uses of wires on or about the dates set forth below:

| COUNT | DATE | DESCRIPTION OF WIRE | AMOUNT |
|---|---|---|---|
| 1 | October 17, 2022 | Wire from account at Capital One N.A. to the 1059 Account | $300,000.00 |
| 2 | October 18, 2022 | Wire from account at Capital One N.A. to the 1059 Account | $1,540,000.00 |
| 3 | September 23, 2020 | Transmission of information related to processing of check no. 6447 from K.A. and R.A.'s account at Exchange Bank deposited in the 1059 Account | $100,000.00 |
| 4 | August 11, 2022 | Transmission of information related to processing of check no. 6910 from K.A. and R.A.'s account from Exchange Bank deposited in the 1059 Account | $50,000.00 |
| 5 | February 3, 2024 | Transmission of information related to processing of check no. 72805 from the 1059 Account deposited in K.A. and R.A.'s Exchange Bank account | $750.00 |
| 6 | January 23, 2024 | Wire transfer from the 1059 Account to an account at Capital One N.A. | $114,789.50 |
| 7 | February 28, 2024 | Wire transfer from the 1059 Account to an account at Capital One N.A. | $100,972.50 |

INDICTMENT                           15

each execution of such scheme being in violation of Title 18, United States Code, Section 1343.

COUNT EIGHT:   (18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)

47. Paragraphs 1 through 46 of this Indictment are re-alleged and incorporated as if fully set forth here.

48. As described above, MATTSON solicited "off-books" investments in Divi Divi for $300,000 from K.B. on October 17, 2022 and for $1.54 million D.R. on October 18, 2022. The third-party custodian received these victim funds and, at MATTSON's direction, wired the funds to MATTSON's 1059 Account.

49. On October 21, 2022, MATTSON sent a wire transfer of $400,000 from the 1059 Account to a construction company. More than $10,000 of this wire transfer is traceable to MATTSON's fraud.

50. On or about October 21, 2022, in the Northern District of California, the Eastern District of California, and elsewhere, the defendant,

KENNETH W. MATTSON,

did knowingly engage in and attempt to engage in a monetary transaction, by, through, and to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Wire Fraud in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1957.

COUNT NINE:   (18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in Federal Investigation)

51. Paragraphs 1 through 50 of this Indictment are re-alleged and incorporated as if fully set forth here.

52. On April 19, 2024, an enforcement attorney at the U.S. Securities and Exchange Commission (SEC) sent MATTSON an e-mail. The e-mail bore the subject line "In the Matter of LeFever Mattson (SF-04674)" and stated, in part, "I am going to send you a document preservation letter through the SEC's secure email system." It also advised MATTSON that the SEC would mail the

INDICTMENT                              16

1 | same letter to his residence in Sonoma, California.

2 |       53.     The SEC attorney subsequently sent MATTSON an e-mail that included a document preservation letter wherein the SEC advised MATTSON that he may "possess documents and data that are relevant to an ongoing investigation being conducted by the staff of the United States Securities and Exchange Commission," identified documents and communications from 2012 to the present related to LM, Divi Divi, and investors, provided notice that such evidence "should be reasonably preserved and retained until further notice," and clarified that "failure to do so could give rise to civil and criminal liability."

      54.     On April 30, 2024, the SEC issued a subpoena *duces tecum* to MATTSON for, among other things, documents concerning Divi Divi, LM, and KSMP.

      55.     On May 7, 2024, the SEC sent a copy of that subpoena to MATTSON via Certified Mail, Return Receipt Requested, to MATTSON at his Sonoma residence.

      56.     On May 8, 2024, the U.S. Postal Service attempted to deliver the subpoena to MATTSON's Sonoma, California residence, but that delivery was unsuccessful because no authorized recipient was available.

      57.     On May 10, 2024, at approximately 9:45 a.m., MATTSON went to the Sonoma Post Office and picked up the envelope containing the subpoena.

      58.     On the same day, May 10, 2024, an attorney representing MATTSON contacted the SEC on MATTSON's behalf. The SEC attorney who had sent MATTSON the initial document preservation request and the subpoena sent MATTSON's attorney a copy of that subpoena. The same day, May 10, 2024, MATTSON's attorney confirmed receipt.

      59.     On May 22, 2024, well after he had been placed on notice of the SEC's investigation and instructed to preserve data, MATTSON deleted more than 10,000 files from his personal computer. These files related to "off-books" investors and limited partnerships in the scheme to defraud, tax documentation such as Form K-1s, partnership agreements, as well as financial and real estate documents. For example, the names of more than 280 of the deleted files contained the word "Divi," or "DDT," more than 125 file names contained "Heacock" or "HPLP," 13 file names contained the last name of D.R., at least three file names that contained the last name of K.B., and at least three file names

INDICTMENT                 17

that contained the last name of K.A.  The names of several of the deleted files referenced LM or KSMP.

60. At the time these files were deleted, MATTSON was at or near 1111 Broadway in Oakland, California, in the Northern District of California.

61. MATTSON deleted the files and changed his mobile phone on the same day—two days before federal law enforcement officers executed a search warrant at his Sonoma residence, where they seized both his computer and his mobile phone, amongst other items.

62. On or about May 22, 2024, in the Northern District of California, the defendant,

KENNETH W. MATTSON,

knowingly altered, destroyed, concealed, and falsified a record, document, and tangible object, specifically electronic files from his laptop computer, with the intent to impede, obstruct, and influence an actual and contemplated investigation of a matter within the jurisdiction of any department and agency of the United States, namely the U.S. Securities and Exchange Commission and the U.S. Department of Justice.

All in violation of Title 18, United States Code, Section 1519.

FORFEITURE ALLEGATION:         (18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c))

The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), Section 982(a)(1), and Title 28, United States Code, Section 2461(c).

Upon conviction for any of the offenses set forth in Counts One through Seven, the defendant,

KENNETH W. MATTSON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations, including but not limited to the real properties located at the following addresses:

a. 62 Farragut Avenue, Piedmont, California 94610;

b. 1834-1836 Ocean Front, Del Mar, California 92014; and

c. 1716 Ocean Front, Del Mar, California 92014.

Upon conviction for any of the offenses set forth in Count Eight, the defendant,

KENNETH W. MATTSON, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in those violations, including but not limited to the real properties located at the following addresses:

    a. 62 Farragut Avenue, Piedmont, California 94610;

    b. 1834-1836 Ocean Front, Del Mar, California 92014; and

    c. 1716 Ocean Front, Del Mar, California 92014.

If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

DATED: May 13, 2025

A TRUE BILL.

*/s/ Foreperson of the Grand Jury*

_____
FOREPERSON

PATRICK D. ROBBINS
Acting United States Attorney

_____/s/_____
CHRISTOFFER LEE
NIKHIL BHAGAT
Assistant United States Attorneys

INDICTMENT                   19