1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  CHRISTOFFER LEE (CABN 280360)
   NIKHIL BHAGAT (CABN 279892)
5
         450 Golden Gate Avenue, Box 36055
6        San Francisco, California 94102-3495
         Telephone: (415) 436-7200
7        FAX: (415) 436-7234

8  Attorneys for United States of America

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        OAKLAND DIVISION

12  UNITED STATES OF AMERICA,            )  NO. CR25-00126 JST
                                         )
13          Plaintiff,                   )  UNITED STATES' OPPOSITION TO
                                         )  DEFENDANT'S MOTION TO MODIFY PRE-
14      v.                               )  TRIAL ASSET RESTRAINT
                                         )
15  KENNETH W. MATTSON,                  )  Date:  July 31, 2025
                                         )  Time: 9:30 a.m.
16          Defendant.                   )  Judge: Hon. Jon S. Tigar
                                         )
17                                       )
    _____ )
18

19

20

21

22

23

24

25

26

27

28
    U.S. Opp. to Def. Mot. to Modify Pre-Trial Asset Restraint
    Case No. CR25-00126 JST
                            1

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND..........................................2

A.    The Indictment and Filing of *Lis Pendens* ......................................................2

B.    The Defendant's Arrest and Bail Proceedings..................................................2

C.    The Bankruptcy Proceedings .............................................................................4

D.    The Subject Assets ..............................................................................................5

      1.    62 Farragut and 1834–1836 Ocean Front ...............................................  5

      2.    210 La Salle.............................................................................................6

E.    Additional Information About the Defendant's Acquisition and Disposition of Assets ...............8

III.  DISCUSSION ....................................................................................................9

A.    A *Lis Pendens* is Not a "Pretrial Restraint" At All ...........................................10

B.    Even if a *Lis Pendens* is a Pretrial Restraint on Assets, the Defendant Has Not Met His Heavy Burden for a Hearing ............................................................................11

      1.    The Defendant Does Not Have a Constitutional Right to Use Tainted Assets to Fund His Criminal Defense ..........................................................................11

      2.    The Defendant Has Failed to Carry His Burden of Showing that He Has Insufficient Assets to Retain Counsel of His Choice......................................12

      3.    The Defendant is Also Not Entitled to a Hearing Because He Has Failed to Make a Prima Facie Showing that the Government Lacks Probable Cause for the Restraint. ......................................................................................16

C.    Even if *Jones-Farmer* Permitted a Hearing, the Subject Properties Are Traceable to Tainted Funds Related to the Scheme, Foreclosing Relief ......................................17

D.    In the Event the Court Construes the Defendant's Motion as an Appeal of the Magistrate Judge's Order Under 18 U.S.C. § 3145(a), Absent the Posting of 210 La Salle or other Adequate Asset, the $4,000,000 Bond Is Insufficient and the Court Should Re-Evaluate the Release Conditions ............................................................................17

IV.   CONCLUSION...................................................................................................19

# TABLE OF AUTHORITIES

**STATUTES**

11 U.S.C. § 363(a) .......... 6

11 U.S.C. § 364(a) .......... 6

18 U.S.C. § 3142(f)(2) .......... 3

18 U.S.C. § 3145 .......... 19

18 U.S.C. § 3771(a)(4) .......... 4, 19

18 U.S.C. § 981 .......... 7

18 U.S.C. § 982 .......... 7

**CASES**

*Aronson v. City of Akron*, 116 F.3d 804 (6th Cir. 1997) .......... 12

Caplin & Drysdale, Chartered v. United States, 491 U.S. 617 (1989) .......... 12

*Cohen v. United States*, 378 F.2d 751 (9th Cir. 1967) .......... 10

*In re KS Mattson Partners LP*, No. 24-10715 (CN) (Bankr. N.D. Cal.) .......... 6

*In re Mattson*, No. 24-10714 (CN) (Bankr. N.D. Cal.) .......... 5

*In re Seizure of: Any and All Funds held in Republic Bank of Arizona Accounts*, No. 2:18-cv-06742, 2019 WL 8892585 (C.D. Cal. Dec. 20, 2019) .......... 14

*Kaley v. United States*, 571 U.S. 320 (2014) .......... 11, 18

*Luis v. United States*, 578 U.S. 5 (2016) .......... 12, 17

*United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013) .......... 14

*United States v. Calderon*, No. 24CR502-JM-2, 2024 WL 2892321 (S.D. Cal. June 10, 2024) .......... 19

*United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001) .......... *passim*

*United States v. James Daniel Good Real Prop*., 510 U.S. 43 (1993) .......... 12

*United States v. Johnson*, No. 18CR4955-H, 2020 WL 2092904 (S.D. Cal. May 1, 2020) .......... 19

*United States v. Jones*, 160 F.3d 641 (10th Cir. 1998), .......... *passim*

*United States v. Kirschenbaum*, 156 F.3d 784  (7th Cir. 1998) .......... 14

*United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990) .......... 19

*United States v. Lacey*, No. CR 18-00422, 2021 WL 5882638 (D. Ariz. Dec. 10, 2021) .................................................................................... 15, 17

*United States v. Li*, No. 3:16-CR-00194, 2018 WL 1299724 (M.D. Pa. Mar. 13, 2018) .................................................................................... 13, 17

*United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991) (en banc) .......... 10

*United States v. Omidi*, 125 F.4th 1283) (9th Cir. 2025) ............................. 18

*United States v. Omidi*, No. CR 17-661(A)-DMG, 2021 WL 7629897 (C.D. Cal. June 15, 2021) ........................................................................ 15

*United States v. Patel*, 888 F.Supp.2d 760, 771 (W.D. Va. 2012) ............. 14

*United States v. Register*, 182 F.3d 830, 836 (11th Cir. 1999) .................. 12

*United States v. Swenson*, No. 1:13-CR-00091-BLW, 2013 WL 3322632 (D. Idaho Jul. 1, 2013) ........................................................................ 15, 17

*United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993) .......... *passim*

*United States v. Wetselaar*, No. 2:11-cr-00347, 2013 WL 8206582, report and recommendation adopted, 2014 WL 1366722 (D. Nev. 2014) ........ 17

1

2

## I.    <u>INTRODUCTION</u>

3

Defendant Mattson's motion, ECF No. 44, styled as a Motion to Modify Pre-Trial Asset

4

Restraint (the Motion), conflates two completely different types of relief.  It seeks two things: (1) a

5

modification of the terms of the defendant's pretrial release to remove certain property as collateral

6

securing bond and (2) expungement of the Government's *lis pendens* on two wholly separate properties

7

in Piedmont and Del Mar, California.

8

As to the request for modification of the defendant's terms of pretrial release—involving 210

9

LaSalle in Piedmont—that is an issue ordinarily evaluated by the judicial officer who conducted the

10

detention hearing: in this case, the Magistrate Judge.  To the extent the defendant is seeking to appeal

11

the Magistrate Judge's order on conditions, this Court should decline to modify the Magistrate Judge's

12

order, but if it does reconsider the conditions set by the Magistrate Judge, it should do so *de novo* and

13

take into account all the information in the record, including that discovered after the hearing before the

14

Magistrate Judge.

15

As to the request for expungement of the *lis pendens*, even assuming that the government's *lis*

16

*pendens* implicate the defendant's ability to retain and hire criminal counsel at all, he has failed to show

17

that the assets involved—62 Farragut in Piedmont and 1834–1836 Ocean Front in Del Mar—are

18

"untainted" and that he lacks other assets to fund his defense.  The defendant is required to make a

19

sufficiently definite, specific, detailed, and nonconjectural showing to enable the court to conclude that a

20

substantial claim is presented.  The defendant's threadbare declaration, which is replete with material

21

omissions and contradictions, and is further belied by extrinsic evidence, is woefully insufficient to meet

22

the standard to obtain a hearing under the relevant framework.  Moreover, even if he *were* to obtain the

23

relief he ultimately seeks—a hearing, and then an order expunging the government's *lis pendens* on the

24

Farragut and Ocean Front properties—that would not allow him to sell them to fund his criminal

25

defense, because as described below, both properties are partially or wholly owned by KS Mattson

26

Partners, LP, an entity over which he no longer has any control.

27

For the reasons that follow, the Court should deny the motion without an evidentiary hearing.

28

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Indictment and Filing of *Lis Pendens*

The grand jury returned an indictment charging the defendant with wire fraud, money laundering, and destruction of documents in a government investigation.  ECF No. 1.  The indictment provided notice to the defendant that his interests in certain real property, including properties located at 62 Farragut Avenue in Piedmont and 1834–1836 Ocean Front in Del Mar, were subject to forfeiture upon conviction.  The government thereafter recorded notices in the appropriate county recorders' offices to alert individuals or entities that may want to transact in the properties of its potential claims.  ECF Nos. 10–12.

### B. The Defendant's Arrest and Bail Proceedings

The defendant was arrested pursuant to an arrest warrant and made an initial appearance on May 23, 2025.  ECF No. 19 (minute entry).  At the hearing, the government moved for the defendant's pretrial detention, citing a risk of flight and an economic danger to the community.  *Id.*; ECF No. 6 (written motion for pretrial detention).  Following a nearly 90-minute initial appearance, the Honorable Alex G. Tse, United States Magistrate Judge, found that the government had met its burden to justify a detention hearing and ordered that one be held.  *Id.  See also* 18 U.S.C. § 3142(f)(2) (judicial officer shall hold a detention hearing in a case that involves serious risk that a defendant will flee or obstruct justice).

At the Magistrate Judge's direction, Pretrial Services conducted a bail study and made two important findings: (1) the defendant posed a risk of non-appearance based on the nature of the offense and possible significant assets reflected in public records, and (2) the defendant posed a "financial danger to the community."  Pretrial Services Report, ECF No. 15 at 10.  Pretrial Services concluded that those dangers could be mitigated by a combination of release conditions, including a $4,000,000 bond fully secured by the defendant's multimillion dollar residence in Sonoma, as well as the property and assets of third parties.  *Id.* at 11.  Notably, according to the Pretrial Services officer, both the defendant and his wife, Stacy Mattson, "declined to discuss" financial resources.  *Id.* at 9.  Pretrial Services also noted that public records searches reflected the defendant was associated with 64 properties, sales of 23

properties with a total value in excess of $28,000,000, 11 property loans, and 24 properties possibly owned by the defendant with an assessed value, sale value, or loan amount totaling over $34,000,000. *Id.*

On May 28, 2025, following an approximately five-hour detention hearing where nine victims spoke about the impact of the defendant's actions on their lives, and after considering the written statements of over 75 victims,[1] the Magistrate Judge adopted pretrial services' view that the defendant posed a risk of flight and a danger to the community, but ultimately concluded that those risks could be mitigated with strict conditions.  Those conditions included:

- a $4,000,000 bond partially secured by the posting of a property on Caballo Alto Court in Reno, Nevada owned by the defendant's sister-in-law, and 210 LaSalle Avenue in Piedmont, to be posted by June 11, 2025;

- Further security to be provided by the posting of $100,000 in cash from the defendant's sister-in-law and another $100,000 in cash from R.L., a friend of the defendant's;

- The defendant's daughter, son, sister-in-law, and brother-in-law as sureties;

- The defendant's wife Stacy Mattson as a surety and custodian;

- Location restrictions, including a GPS device and restriction to the Northern and Eastern Districts of California.

Importantly, one of the reasons that the Magistrate Judge ultimately decided against requiring the posting of the defendant's $7 million Sonoma residence as recommended by Pretrial Services is because it was titled in the name of KS Mattson Partners (KSMP), an entity that was mired in bankruptcy proceedings, as described below.

On June 11, 2025, the Magistrate Judge held a further hearing on conditions of the defendant's release.  The defendant submitted a status report in advance, ECF No. 33; the government submitted a brief in opposition, ECF No. 35.  At that hearing, the Magistrate Judge revised the defendant's conditions of release to restrict his movement to the Northern District of California and Solano County,

---

[1] Under the Crime Victims' Rights Act, victims have a statutory right to participate in public proceedings related to a defendant's release.  *See* 18 U.S.C. § 3771(a)(4).

1  and imposed a condition that the defendant may not solicit investments or act as a fiduciary or manage

2  the finances of others.  ECF No. 37.  During the hearing, the Magistrate Judge issued a superseding bond

3  reflecting these changes but maintaining several of the original conditions, including the requirement to

4  post the LaSalle property and the total of $200,000 cash in additional security.  *Id.*

5      Despite the Court's prior order, at the time of the June 11 hearing, the defendant had taken no

6  steps to post the LaSalle property with the Clerk of Court, and during the hearing, counsel suggested to

7  the Magistrate Judge that there was an unspecified "Sixth Amendment" issue with posting it.  The

8  Magistrate Judge set a briefing schedule and ordered the defendant to file a brief on the issue within two

9  weeks, *see* ECF No. 25.  In response, the defendant filed this omnibus motion.

10     **C.     The Bankruptcy Proceedings**

11     As of the May 28, 2025 detention hearing before the Magistrate Judge, the defendant and KSMP

12  were both resisting efforts to enter involuntary bankruptcy.  Mattson is not currently in bankruptcy, but

13  the Bankruptcy Court has ordered him to comply with Sections 363 and 364 of the Bankruptcy Code.

14  Preservation Order Under 11 U.S.C. § 303(f), ECF No. 91, *In re Mattson*, No. 24-10714 (Bankr. N.D.

15  Cal. May 11, 2025).  That means that he may not engage in any transactions "other than in the ordinary

16  course of business," 11 U.S.C. § 363(a), but it allows him to "obtain unsecured credit and incur

17  unsecured debt in the ordinary course of business." 11 U.S.C. § 364(a).[2]

18     On June 9, 2025, the Bankruptcy Court entered a stipulated order, prepared by Mattson's

19  counsel, that placed KSMP into Chapter 11 bankruptcy proceedings.  Stipulated Ord. for Relief in an

20  Involuntary Case, ECF No. 131, *In re KS Mattson Partners LP*, No. 24-10715 (CN) (Bankr. N.D. Cal.

21  Jun. 9, 2025).  The Court appointed an independent director—Robbin Itkin—to "solely be responsible

22  for the duties and obligations of [KSMP]" and vested her "with the authority to operate [KSMP's]

23  business."  *Id.* at 2.  In seeking the Order, Ms. Itkin told the Bankruptcy Court that she intended to hire

24  a third party to serve as KSMP's Chief Restructuring Officer, "with primary responsibility for managing

25

26  _____

27     [2] At the detention hearing, Mattson's counsel raised the issue of whether the LaSalle property
    could be posted, given the defendant's possible community property interest in it and the Bankruptcy
    Court's orders.  Whether or not that is the case, Mattson has not sought any relief from the Bankruptcy
28  Court to enable him to comply with the Magistrate Judge's orders.

1    [KS Mattson]'s real estate portfolio, including rent collection, property oversight, asset preservation,

2    analysis and implementation of asset sales and potential financing opportunities."  Decl. of Robbin L.

3    Itkin in Supp. of Debtor's Mot. for Ord. Authorizing Designation of Robbin L. Itkin as Responsible

4    Individual Pursuant to B.L.R. 4002-1 at 5, ECF No. 134, *In re KS Mattson Partners, LP*, No. 24-10715

5    (CN) (Bankr. N.D. Cal. Jun. 9, 2025).  *See also* Final Ord. Auth. Designation of Robbin L. Itkin as

6    Responsible Individual Pursuant to B.L.R. 4002-1, ECF No. 172, *In re KS Mattson Partners, LP*, No.

7    24-10715 (CN) (Bankr. N.D. Cal. Jun. 24, 2025).  In appointing Ms. Itkin, the Bankruptcy Court

8    expressly directed that "[n]one of Kenneth Mattson, Stacy Mattson or K.S. Mattson Company, LLC

9    shall have any authority, express or implied, to act on behalf of [KSMP], bind [KSMP], operate the

10   Debtor's business, access any of the Debtor's assets or any property of the estate.  Any such actions

11   shall be void ab initio and a violation of this Order."  *Id.* at 3.

12         In summary, Mattson himself is still not in bankruptcy, but subject to a preservation order.

13   KSMP is now in Chapter 11 bankruptcy and is under the control of Ms. Itkin and the Bankruptcy Court.

14   Mattson has no control over KSMP's assets.

15         **D.    The Subject Assets**

16              **1.    62 Farragut and 1834–1836 Ocean Front**

17         As described above, the Motion implicates two different classes of assets: the property the

18   Magistrate Judge ordered Mattson to post to secure his bond (210 LaSalle) and the properties the

19   indictment alleges are subject to forfeiture (Farragut and Ocean Front).  What follows is some

20   background information about those properties.

21         The indictment notices forfeiture of three properties alleged to be property constituting or

22   derived from proceeds the defendant obtained directly and indirectly as a result of the violations charged

23   in the indictment:  62 Farragut Avenue in Piedmont, 1834–1836 Ocean Front in Del Mar, and 1716

24   Ocean Front in Del Mar.  ECF No. 1 at 19.  The defendant's Motion seeks to challenge the forfeiture of

25   only two of those: 62 Farragut and 1834–1836 Ocean Front.[3]

26

27              [3] The indictment also alleges that 1716 Ocean Front may be subject to forfeiture, but the Motion
     does not appear to challenge the *lis pendens* on this property, presumably because the defendant
     transferred title to 1716 Ocean Front in Del Mar to a third party in July 2024, after the search warrant
28   execution in this case, via a $19 million seller carry-back financing note.

1    The residence at 62 Farragut consists of two parcels with separate Assessor Parcel Numbers: one

2    titled in the name of the defendant and the other titled in the name of KSMP.[4]  Declaration of AUSA

3    Christoffer Lee ("Lee Decl."), Exs A and B.  In July 2024, 1834–1836 Ocean Front was transferred from

4    KSMP to the same third party who now owns 1716 Ocean Front.  In April 2025, however, it appears that

5    the third party transferred title to 1834–1836 Ocean Front back to KSMP.  Lee Decl., Ex. C (reflecting

6    chain of title and July 2024 transfer from KSMP), Ex. D (reflecting transfer of both 1716 Ocean Front

7    and 1834-36 Ocean Front), and Ex. E (reflecting correction to remove transfer of 1834-1836 Ocean

8    Front, confirming that KSMP holds title).  Thus, as of this writing, part of 62 Farragut and all of 1834–

9    1836 Ocean Front are under the control of KSMP's Responsible Officer Robbin Itkin, and not Mattson.

10    **2.    210 La Salle**

11    210 La Salle is differently situated.  The indictment did not expressly notice forfeiture of 210 La

12    Salle.[5]  210 La Salle is titled in the name of Stacy Mattson.  At the May 28, 2025 detention hearing,

13    given limitations on the defendant's ability to control KSMP properties, and the fact that 210 La Salle

14    appeared to be a property not owned by KSMP but controlled by the defendant and his wife Stacy

15    Mattson,[6] the Magistrate Judge ordered that 210 La Salle be posted to partially secure the $4,000,000

16    bond.  ECF No. 23.

17    The defendant filed the instant Motion on June 25, 2025, seeking amongst other relief, an order

18    that the defendant "shall not be required to post as security for his bail the property located at 210 La

19    Salle."  ECF No. 44-2.  The defendant submitted a sworn declaration in support of the Motion.  ECF 44-

20    1 ("Mattson Decl.").  The government has subsequently learned additional information—omitted from

21    the defendant's declaration and Motion—that may be relevant to the Court's analysis.  For example, the

---

[4] It is unclear whether the defendant could dispose of one parcel at 62 Farragut without disposing of the other; the two parcels appear to be inextricably intertwined.

[5] The indictment did not expressly notice 210 LaSalle, but the government's continuing investigation has revealed that Mattson has used at least some investor funds to fund mortgage payments for this property, which means that it may too well be subject to forfeiture under 18 U.S.C. §§ 981, 982.

[6] Stacy Mattson was also ordered to be a custodian for the defendant, and thus the requirement that 210 La Salle be posted as collateral helped to increase the moral suasion on the defendant to comply with the conditions.

1   defendant asserts 210 La Salle is "titled in my wife [Stacy Mattson]'s name."  That is technically true,

2   but the government has subsequently learned that an unrelated individual (WITNESS-1) is a one-third

3   owner of the property and the property is heavily indebted—facts the defendant omitted from his

4   declaration.

5           On June 26, 2025, federal agents interviewed WITNESS-1, who reported the following.  *See*

6   *generally* Lee Decl. Exs. F and G (FBI 302 Interview Memoranda of WITNESS-1) (filed under seal).

7   On or about November 17, 2003, WITNESS-1 entered into a "co-ownership agreement" with Mattson

8   (acting on behalf of KSMP)[7] under which WITNESS-1 invested $333,000 with the defendant in

9   exchange for a 33.33% interest in 210 LaSalle.  WITNESS-1 maintains he still holds that ownership

10  interest.  Pursuant to the terms of the agreement, WITNESS-1's interest in the property is secured by a

11  $460,000 deed of trust that is on file with the Alameda County Recorder's Office.  The written

12  agreement between Mattson and WITNESS-1 contemplates that the parties may transfer interest in the

13  property "[u]pon mutual agreement" but does not appear to provide for a unilateral transfer by either

14  party.  Lee Decl. Ex. H at Section 1.08 (filed under seal).

15          WITNESS-1 has lived at 210 La Salle for over 20 years and has paid and has continued to pay

16  the defendant his share of expenses and property taxes for the property.  WITNESS-1 asserts that the

17  property is subject to a $2 million mortgage with an estimated balance of $1 million.  While WITNESS-

18  1 is aware that Stacy Mattson's name is on the title to 210 LaSalle, WITNESS-1 has only ever dealt with

19  the defendant and never with Stacy.  Although WITNESS-1 has repeatedly asked Mattson to put

20  WITNESS-1 on the title, Mattson has not done so.  The property is currently in foreclosure.  Lee Decl.,

21  Ex. F at 3.

22          WITNESS-1, who has paid Mattson at least hundreds of thousands of dollars in property taxes

23  and mortgage payments on the property, believes that the property has an approximate market value of

24  $3.5 million.  After the $1 million loan is paid off, WITNESS-1 would be entitled to one-third of the

25  remaining equity.  *Id.*

26

27          [7] At the time, 210 LaSalle was titled in the name of KSMP and only later transferred to Stacy

28  Mattson.

1    According to WITNESS-1, the defendant never contacted him regarding the Magistrate Judge's

2    order that 210 La Salle be posted as security for the defendant's bond or regarding the defendant's filing

3    of the instant Motion.  Lee Decl., Ex. G.  Nor has he been served with the instant Motion or been given

4    any notice of the defendant's attempts to use this property—WITNESS-1's home for over 20 years, in

5    which he holds a significant financial interest—to pay attorneys' fees in the defendant's criminal case.

6    **E.    Additional Information About the Defendant's Acquisition and Disposition of Assets**

7    In September 2024, Stacy Mattson purchased two brand new vehicles, in cash paid-in-full—one

8    for $105,059.163 (less $10,000 in trade-in value) and one for $84,473.50, one of which the defendant

9    was driving on the day of his arrest.  ECF 6 at 10; Lee Decl., Exs. I and J (filed under seal).  The

10   defendant's declaration omits reference to this property—which appears to be of more than mere

11   "nominal value," *Cf.* Mattson Decl. ¶ 8—and does not attempt to explain why it could not be sold to

12   fund his defense.  The government does not have access to the defendant's reporting to Pretrial Services

13   of any transactions over $5,000, but any such transactions—if reported—would also help to inform the

14   analysis about his lack of present funds.  Such reporting is also absent from the defendant's declaration.

15   There are also large tranches of assets that appear to have been sold in 2024, the proceeds of

16   which could presumably fund the defendant's defense.  Between August 27, 2024 and February 14,

17   2025, the defendant (both personally and through his then alter-ego, KSMP) received $2,924,775.34 in

18   relation to the sale of approximately 40 classic cars.  Lee Decl., Ex. K (filed under seal).  The individual

19   who assisted the defendant with the sales is one of the sureties on his bond (SURETY 1).  *Id.*  The

20   declaration is silent as to whether these funds, for example, could be used to fund his defense.

21   Finally, on June 20, 2025, federal agents interviewed two witnesses who told them that Ken and

22   Stacy Mattson anticipated the May 2024 execution of a search warrant at their home and "started

23   preparing for it at least the week of the raid in May of 2024."  Specifically, according to these witnesses,

24   in anticipation of the search warrant execution, Mattson and his wife began to sell off assets, including

25   personal luxury items and jewelry with the assistance of SURETY 1.  Moreover, the witnesses reported

26   that the defendant and Stacy Mattson gave SURETY 1 valuables to store at their home.  SURETY 1 also

27   set up a bank account in SURETY 1's own name for Stacy Mattson's use so that Stacy could have

28

1  money "stashed away" in case the defendant went "away forever" when the FBI came.  Lee Decl., Ex. L

2  (filed under seal).

### III.    DISCUSSION

4      A criminal defendant may challenge the forfeitability of his assets if he presents a "sufficiently

5  definite, specific, detailed, and nonconjectural" argument that demonstrates seized funds are untainted

6  **and** necessary to mount a legal defense.  *See United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir.

7  1993) (quoting *Cohen v. United States*, 378 F.2d 751, 761 (9th Cir. 1967)) (internal quotation marks

8  omitted and emphasis added).

9      Only if the defendant makes the required showing can the court schedule a hearing on the non-

10  forfeitability of assets.  Such a hearing is often referred to as a *Monsanto* hearing after *United States v.*

11  *Monsanto*, 924 F.2d 1186, 1191 (2d Cir. 1991) (en banc) ("*Monsanto IV*"), *abrogated on other grounds*

12  *by Kaley v. United States*, 571 U.S. 320 (2014).  In *Monsanto IV*, the Second Circuit held that, if assets

13  are restrained, "a pre trial adversary hearing is required where the question of attorney's fees is

14  implicated."  924 F.2d at 1191.  The vast majority of the cases that have examined *Monsanto IV* have

15  adopted what is often called the *Jones-Farmer* rule, so named after the Tenth and Fourth Circuits'

16  decisions in *United States v. Jones*, 160 F.3d 641, 647–48 (10th Cir. 1998), and *United States v. Farmer*,

17  274 F.3d 800, 804–05 (4th Cir. 2001).  Because of the strong interest in preserving assets for the return

18  to victims, under the *Jones-Farmer* rule, a defendant is not entitled to a *Unimex*/*Monsanto* hearing

19  unless and until the defendant establishes **both**: (1) an actual need for the restrained assets for attorneys'

20  fees or living expenses; and (2) that there is some substantial evidence that the assets are not

21  forfeitable—*i.e.* cannot be traced to tainted funds.  Only then is he entitled to have the Court hold a

22  *Unimex*/*Monsanto* hearing wherein the government must demonstrate probable cause that the property is

23  traceable to the crime.  *Jones*, 160 F.3d at 647–48.  And even at such a hearing, the defendant may not

24  relitigate or challenge the grand jury's probable cause determination that the defendant committed an

25  offense permitting forfeiture.  *Kaley v. United States*, 571 U.S. 320, 323–24, 398 (2014).

26      While framed as a general Sixth Amendment challenge to pretrial "restraint of assets," the

27  defendant's motion actually seeks two distinct forms of relief governed by different legal standards:  (1)

28

1    modification of the order setting conditions of release and a ruling that 210 La Salle—a property titled in

2    the name of Stacy Mattson—not be posted as security in support of the defendant's $4,000,000 release

3    bond; and (2) a motion to expunge the government's *lis pendens* on certain properties so that the

4    defendant can sell those properties and use the money to pay two criminal defense lawyers.

5         To the extent the defendant seeks to remove *lis pendens* and prevent subsequent forfeiture of 62

6    Farragut and 1834–1836 Ocean Front (the "Subject Properties" or "Subject Assets"), he has failed to

7    meet his burden for so much as a hearing on the matter, let alone for ultimate relief.  Dispositively, the

8    defendant has failed to satisfy his burden under the two-step *Jones-Farmer* framework—which governs

9    Sixth Amendment claims like his—to show that he has no other untainted assets available to fund his

10   legal defense.  Thus, the defendant is not entitled to a *Unimex/Monsanto* hearing and the Court must

11   deny the motion given the defendant's failure at Step One.  Moreover, he has failed to make a

12   substantial claim that the subject assets are untainted, and thus also fails at Step Two.  Finally, even if

13   the Court were to hold such a hearing, the government would be able to show probable cause that the

14   Subject Assets are subject to forfeiture.

15        **A.    A Lis Pendens is Not a "Pretrial Restraint" At All**

16        The government has recorded a *lis pendens* as to the Farragut property and a *lis pendens* as to the

17   Ocean Front property.  The defendant seeks an order lifting these, calling them "pre-trial restraints."

18   Mot. at 7:5-6 (arguing *lis pendens* "notices act as a functional freeze on assets.")  But a *lis pendens* is not

19   a pretrial restraint at all.  It places no legal restrictions on the disposition of property by its lawful owner.

20   Instead, it is simply a notice—a notice to the public that the United States may have some interest in the

21   property due to pending litigation.  Although that notice may have the practical effect of impairing the

22   property's value or its alienability, several courts have concluded that it is not ultimately a legal

23   restraint, at least not one of Constitutional dimension.  "In short, a filing of a *lis pendens* pursuant to

24   state statute does not constitute a 'seizure' and does not affect property interests to an extent significant

25   enough to implicate the Due Process Clause of the Fifth Amendment."  *United States v. Register*, 182

26   F.3d 830, 836 (11th Cir. 1999).  The filing of a *lis pendens* is fundamentally different than cases in

27   which the government *actually* restrains property pretrial, such as by seizing it pursuant to a warrant.

28

The Supreme Court recognized this important distinction in *United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993), where, in affirming a ruling that held that the government had violated due process by seizing a property pursuant to a seizure warrant, it observed that the filing of a *lis pendens* was a less restrictive method of asserting the government's interests in forfeitable property. *Id.* at 58. *See also Aronson v. City of Akron*, 116 F.3d 804, 812 (6th Cir. 1997) ("The mere filing of an ordinary lien or *lis pendens* notice simply does not represent the sort of 'grievous loss' that necessitates prior notice and an opportunity to be heard" (cleaned up)). A *lis pendens* is not a pretrial restraint. But as described below, even if the Court assumes it is, it should still deny the defendant a hearing because Mattson has failed to meet the requisite showing.

### B. Even if a Lis Pendens is a Pretrial Restraint on Assets, the Defendant Has Not Met His Heavy Burden for a Hearing

#### 1. The Defendant Does Not Have a Constitutional Right to Use Tainted Assets to Fund His Criminal Defense

The Sixth Amendment's guarantee of legal representation is not absolute. A criminal defendant represented by retained counsel is limited to hiring an attorney whose fees he can afford. *Luis v. United States*, 578 U.S. 5, 12 (2016). Additionally, the Sixth Amendment does not guarantee a criminal defendant the right to expend illegally obtained assets on his defense. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989). Therefore, a criminal defendant's Sixth Amendment rights are not violated if he is prevented from expending forfeitable assets on his criminal defense. *United States v. Monsanto*, 491 U.S. 600, 615 (1989).

In *Luis*, the Supreme Court held that "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Id.* at 10. But Mattson's reliance on *Luis* is misplaced, because he has not (and cannot) show that the Subject Assets are legitimate or untainted. *See United States v. Li*, No. 3:16-CR-00194, 2018 WL 1299724, at *10 (M.D. Pa. Mar. 13, 2018) ("The holding in *Luis* was limited: the Government may not restrict the property of a criminal defendant when there has been no finding of probable cause or property has not been traced to an offense contained within the indictment, and the Defendant wishes to use those funds to retain counsel").

The defendant's motion strangely claims that the "the government does not allege that the assets

1   were obtained because of the conduct alleged in the indictment." Mot. at 5. But the grand jury's

2   indictment specifically alleges that the Subject Assets are property constituting or derived from proceeds

3   the defendant obtained directly and indirectly as a result of the violations charged in the indictment, and

4   that they are subject to forfeiture. Indictment ¶ 19, ECF No. 1. Neither the defendant's motion nor his

5   declaration rebut that allegation.

### 2.    The Defendant Has Failed to Carry His Burden of Showing that He Has Insufficient Assets to Retain Counsel of His Choice.

7    The defendant asks for the expungement of the *lis pendens* on the Subject Properties, or

8   alternatively, for a hearing. As noted above, a criminal defendant may challenge the forfeitability of his

9   assets if he presents a "sufficiently definite, specific, detailed, and nonconjectural" argument that

10  demonstrates seized funds are untainted and necessary to mount a legal defense. *See Unimex.*, 991 F.2d

11  at 551 (citation and internal quotation marks omitted); *Jones*, 160 F.3d at 647-48; *Farmer*, 274 F.3d at

12  804-05. Because of the strong interest in preserving assets for return to victims, under the *Jones-Farmer*

13  rule, courts will continue pre-trial restraints unless and until the defendant establishes both: (1) an actual

14  need for the restrained assets for attorneys' fees or living expenses; and (2) that there is some substantial

15  evidence that the assets are not forfeitable. In other words, "[d]ue process does not automatically

16  require a hearing and a defendant may not simply ask for one." *Jones*, 160 F.3d at 647.

17   The right to a hearing is triggered *only* once those two elements have been satisfied. *Jones*, 160

18  F.3d at 647–48 (defendant challenging pre-trial restraint of assets alleged to be forfeitable has initial

19  burden of showing that she has no funds other than the restrained assets to hire private counsel or to pay

20  living expenses, and that there is a bona fide reason to believe the restraining order should not have been

21  entered). The defendant has the burden of persuasion on the issue of whether he has insufficient

22  unrestrained assets to pay an attorney. *Farmer*, 274 F.3d at 804 (defendant must make threshold

23  showing of need to use restrained assets to pay attorney); *Jones*, 160 F.3d at 647.

24   Here, the defendant has submitted a threadbare declaration that claims, without more, that his

25  "assets are insufficient to pay [his] chosen counsel." Mattson Decl. ¶ 8. That is simply not enough;

26  courts routinely find such self-serving and conclusory affidavits insufficient to trigger a hearing. For

27  example, in *United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013), the Court of Appeals sustained a

district court's finding that the defendant failed to satisfy this threshold requirement where he "did not disclose his net worth, provide a comprehensive list of his assets, or explain how he has been paying his significant living expenses." *Id.* at 133. Of relevance here, Mattson is currently residing in a 7600 square-foot residence on a nearly 50-acre lot which appears to be valued in excess of $7 million. *See generally* ECF No. 37 (identifying defendant's residence). He has not attempted to explain how he is funding the upkeep of that property. *See also United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (defendant's "bare-bones affidavit asserting that he personally lacked sufficient funds to obtain counsel of his choice" was inadequate); *In re Seizure of: Any and All Funds held in Republic Bank of Arizona Accounts*, No. 2:18-cv-06742, 2019 WL 8892585, at *8 (C.D. Cal. Dec. 20, 2019) (no hearing where claimants "have made no attempt" at showing a definite, specific, detailed, and nonconjectural claim). *Compare United States v. Patel*, 888 F.Supp.2d 760, 771 (W.D. Va. 2012) (granting *Farmer* hearing where defendant submitted "numerous affidavits, documents, bills, and checks, detailing his current financial situation and need for the restrained substitute assets in order to pay his counsel").

Nor are the unsworn, vague and conjectural assertions in the Motion, *e.g.,* Mot. at 7–8 ("The value of Mr. Mattson's untainted assets is anticipated to be more than sufficient to cover legal services that he would require through trial . . . .With access to the funds from the untainted Restrained Properties, however, Mr. Mattson could afford to pay for his legal representation") adequate to sustain Mattson's burden. "To determine whether a hearing is required, the court must decide whether the moving papers filed, including affidavits, are sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *Unimex*, 991 F.2d at 551. "*Unimex* teaches that a court may be required to hold a pretrial hearing to determine whether all or some of seized assets should be returned in order to protect a criminal defendant's constitutional rights—but only if the defendant submits affidavits that are 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.'" *United States v. Swenson*, No. 1:13-CR-00091-BLW, 2013 WL 3322632, at *7 (D. Idaho Jul. 1, 2013) (citing *Unimex,* 991 F.2d at 551). "If criminal defendants fail to make this initial showing, then their private interests in

1   obtaining their counsel of choice are outweighed by the government's interests, including the

2   government's significant interest in preserving forfeitable assets." *Id.* (finding the defendant "failed to

3   show a hearing was warranted" where they "failed to put forth evidence that they have no assets to retain

4   private counsel without the seized funds, and that there was no probable cause to forfeit the funds.")

5          And here, the defendant's failure to make a showing of insufficient unrestrained assets is

6   amplified by the ample other evidence showing the existence of alternative assets, and the open

7   questions—unanswered by the defendant's declaration or his Motion—about where those assets went.

8   The defendant acknowledges retaining defense counsel Randy Sue Pollock in April 2024 and William

9   Frentzen in February 2025.  Mot. at 7.  Presumably, the defendant has paid criminal defense counsel,

10  who he retained in mid-2024, some funds to date.  But the defendant has failed to mention how much he

11  has expended to retain counsel and whether that retainer has been exhausted, or whether any family

12  members have sufficient assets to fund his defense—all key factors in determining whether there are

13  truly no other assets to pay counsel.  *See United States v. Lacey*, No. CR 18-00422, 2021 WL 5882638

14  at *9 (D. Ariz. Dec. 10, 2021) (finding that defendants failed to make requisite showing for a hearing

15  where they did not "attach any declarations from Defendants explaining how much they need to pay

16  counsel or prepare for trial, what their trial budget might be, what expenses they intend to pay from any

17  released funds, what would become of any unspent or excess funds not ultimately paid to counsel, or

18  even swearing that they will actually use any funds released to pay counsel"); *United States v. Omidi*,

19  No. CR 17-661(A)-DMG, 2021 WL 7629897, at *5–*9 (C.D. Cal. June 15, 2021) (finding defendant

20  failed to make threshold showing that he lacks funds and access to funds for his defense, including

21  failure to establish that prior access to funds for legal defense were depleted).

22         As described in the government's prior filings, *see, e.g.,* ECF No. 6 at 10, less than a year ago,

23  the defendant and his wife paid nearly $180,000 in cash for two brand-new cars, neither of which are

24  encumbered by a loan.  Lee Decl., Exs. I and J.  Records obtained by the government suggest that

25  Mattson sold $2.9 million in classic cars over the last year.  Between August 2024 and February 2025—

26  after his scheme had unraveled and after federal law enforcement had searched his house, but while

27  KSMP was still under Mattson's control—records from the Bonhams Auction House reveal that

28

$2,924,775.34 was paid to Mattson or KSMP.  Lee Decl., Ex. K.  The defendant's declaration does not begin to touch on why these funds are unavailable for his defense.  Similarly, Mattson's failure to answer standard financial questions from Pretrial Services means that the parties and the Court have no basis on which to meaningfully evaluate his claims of indigence.

Moreover, the significant material omissions and contradictions in the declaration the defendant *did* submit should cause the Court to reject it as unreliable.  While Mattson claims on the one hand to "own or control" the 62 Farragut and 1834–1836 Ocean Front properties, Mattson Decl. ¶ 1, in the next breath he acknowledges that he does not have control over KSMP properties.  *Id.*  ¶¶ 5-6.  Mattson's sworn declaration fails to mention that 1834–1836 Ocean Front is currently titled in the name of KSMP and that at least part of 62 Farragut is too— and thus both are out of his control.  The Motion does not even broach the question of whether KSMP's responsible individual (or the Bankruptcy Court) would ever assent to a plan in which Mattson would dispose of KSMP assets for his sole personal benefit at the expense of creditors (including victim-investors)—a highly dubious proposition.  The claim that Mattson needs the government's *lis pendens'* lifted because he needs to sell these properties to pay multiple criminal defense lawyers is fatally flawed because it assumes that he has the ability to sell them; that assumption is wrong.

Also, even accepting for the sake of argument the defendant's own unsupported "estimated" value of "approximately" $21 million, that number fails to consider that both properties are both heavily encumbered.  As of December 23, 2024, there was an outstanding loan balance on 62 Farragut of approximately $3.34 million.  As to 1834–1836 Ocean Front, as of December 23, 2024, there was an outstanding loan balance of approximately $5.167 million.  In sum, the defendant's declaration is not only insufficient and incomplete; it is misleading.  The Court should disregard it.

Because the defendant has not met his threshold showing of demonstrating that he has no funds other than the Subject Assets to pay his lawyers, the Court need not go any further—it should deny the motion without a *Unimex*/*Monsanto* hearing.

1

### 3. The Defendant is Also Not Entitled to a Hearing Because He Has Failed to Make a Prima Facie Showing that the Government Lacks Probable Cause for the Restraint.

2

3      The second *Jones-Farmer* requirement, that there be a prima facie showing that the Government

4   lacked probable cause for the restraint, protects against the defendant's use of the probable cause hearing

5   to gain pretrial access to witnesses and other evidence that the Government intends to use at trial. *Jones*,

6   160 F.3d at 647 (defendant must show at second prong that there is bona fide reason to believe the

7   restraining order should not have been entered). District courts interpreting *Unimex* have held that the

8   defendant must make a "substantial claim" supported by specific, detailed and nonconjectural

9   allegations, that the government lacked probable cause for the restraint. *See, e.g.*, *Swenson*, 2013 WL

10   3322632 at *8; *United States v. Wetselaar*, No. 2:11-cr-00347, 2013 WL 8206582, at *19–20, 22-24 (D.

11   Nev. 2013), report and recommendation adopted, 2014 WL 1366722 (D. Nev. 2014) (finding defendants

12   failed to meet showing); *see also Li*, 2018 WL 1299724 at *10 (Defendant does not proffer any reason

13   to believe that the grand jury erred in its determination that there was probable cause that the assets

14   seized were traceable to the crimes charged). This requirement did not change with the Supreme

15   Court's decision in *Luis*. *See Lacey*, 2021 WL 5882638 at *8 ("After *Luis*, Defendants argue all they

16   need to assert is that the funds are not traceable to the crimes in the indictment, i.e., are untainted. The

17   Court disagrees.").

18      The defendant's motion offers little in the way of challenging the probable cause determination

19   and the declaration offers less. For example, the Motion asserts that the defendant has owned 62

20   Farragut since 1999 "well before any fraud is alleged to have occurred." Mot. at 9. But much like the

21   defendant's incomplete declaration, the Motion omits that 62 Farragut is heavily mortgaged and that the

22   defendant used proceeds of the fraud to make payments on that mortgage. The Motion also asserts that

23   "the government does not allege that the assets were obtained because of the conduct alleged in the

24   indictment," Mot. at 5, but that seemingly ignores the black letter of the indictment's forfeiture

25   allegations. These two incomplete statements are not any indication, let alone a "substantial claim" that

26   is "sufficiently definite, specific, detailed, and nonconjectural" to establish that the Subject Assets are

27

28

untainted. *Unimex*, 991 F.2d at 551.  Accordingly, the defendant has also failed to make the requisite

showing at Step Two.  The Court should deny the motion without a *Unimex/Monsanto* hearing.

### C.    Even if *Jones-Farmer* Permitted a Hearing, the Subject Properties Are Traceable to Tainted Funds Related to the Scheme, Foreclosing Relief

As described above, the defendant's unspecific barebones allegations fail to meet the threshold

for a *Unimex/Monsanto* hearing.  But even if the Court were to hold such a hearing, the government

would show that funds used to finance the properties at issue can be traced to the scheme alleged in the

indictment.  At a *Unimex/Monsanto* hearing, the Government must demonstrate that there is probable

cause that the assets are indeed forfeitable upon conviction.  Generally, probable cause has two

components: "(1) that the defendant has committed an offense permitting forfeiture," which is

established by a grand jury's indictment, and "(2) that the property at issue has the requisite connection

to that crime," in other words, that the property is traceable to the alleged offense.  *Kaley*, 571 U.S. at

323–24, 398.  A defendant may challenge probable cause only on the second ground during a *Monsanto*

hearing. *Id.* at 398.  Here, at any such hearing, the government would show that proceeds of the scheme

were used to make payments on mortgages at 62 Farragut and 1834-1836 Ocean Front which means

there is probable cause for their forfeiture.  *Cf. United States v. Omidi*, 125 F.4th 1283, 1288–89) (9th

Cir. 2025) ("we follow our sister circuits to conclude that in a forfeiture case seeking proceeds of a fraud

scheme under § 981(a)(1)(C), there is no so-called "100% Fraud Rule." All proceeds directly or

indirectly derived from a health care fraud scheme like Get Thin—even if a downstream legitimate

transaction conceivably generated some of those proceeds—must be forfeited.")  But again, the Court

need not hold such a hearing because the defendant has not met his burden to get one.

### D.    In the Event the Court Construes the Defendant's Motion as an Appeal of the Magistrate Judge's Order Under 18 U.S.C. § 3145(a), Absent the Posting of 210 La Salle or other Adequate Asset, the $4,000,000 Bond Is Insufficient and the Court Should Re-Evaluate the Release Conditions

If the Court construes the defendant's request regarding 210 La Salle as an appeal of the

Magistrate Judge's order under 18 U.S.C. § 3145, this Court's review of a magistrate judge's bail order

is *de novo. See United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990).  The district court "is not

required to start over in every case, and proceed as if the magistrate's decision and findings did not

1  exist." *Id.* at 1193. The district court should still "review the evidence before the magistrate and make

2  its own independent determination whether the magistrate's findings are correct, with no deference." *Id.*;

3  *United States v. Johnson*, No. 18CR4955-H, 2020 WL 2092904 at *1 (S.D. Cal. May 1, 2020)

4  (reviewing *de novo* Magistrate Judge's bail order); *see also United States v. Calderon*, No. 24CR502-

5  JM-2, 2024 WL 2892321, at *2 (S.D. Cal. June 10, 2024).

6       As described above, the defendant's request to remove 210 LaSalle from his bond is a request to

7  modify the terms of his release.  The Court should either decline to rule on the matter in the first

8  instance or construe the defendant's motion as an appeal pursuant to 18 U.S.C. § 3145(a) and conduct a

9  full review in it considers all available facts and evidence and determines *de novo* whether there are

10 actually sufficient terms and conditions that would reasonably assure the defendant's appearance as

11 required and sufficiently mitigate the defendant's danger to the community.[8]

12      The Magistrate Judge evaluated the factors under the Bail Reform Act and crafted stringent

13 conditions to reasonably assure the defendant's appearance as required and mitigate his danger to the

14 community, based on information known to the court at the time.  A surety posted her home in Reno,

15 Nevada and $100,000 in cash.  The combined value of those assets is approximately $780,000, far short

16 of the $4 million bond amount.[9]  Because 210 La Salle was held in title by Stacy Mattson, the

17 Magistrate Judge ordered—based on information known at that time—that 210 La Salle should be

18 posted to help secure the bond, in part, to assure that adequate moral suasion existed.  A bond without

19 the security of the LaSalle property or an adequate, untainted alternate asset would be insufficient to

20 secure the defendant's appearance.

21      Moreover, given the new information the government has learned since the detention hearing,

22 the adequacy of even those initial conditions—including choice of sureties and custodian (Stacy

23 Mattson) are in question.  The revelation that 210 La Salle appears to be co-owned by a third party—a

24

25      [8] If the Court determines that it should hold a *de novo* hearing on the defendant's conditions of
    release, the United States respectfully requests notice sufficient to notify Mattson's victims, who are
26  statutorily entitled to be reasonably heard at any "public proceeding . . . involving release."  18 U.S.C.
    § 3771(a)(4).
27
        [9] The defense has subsequently informed the Magistrate Judge that the other surety who agreed
28  to post $100,000 in security on Mr. Mattson's behalf—R.L.—no longer wishes to do so.

fact known to the defendant but never disclosed to the Magistrate Judge—may bear upon the Court's analysis of whether conditions exist that can reasonably assure the defendant's appearance at future court proceedings.  As noted above, the government has learned that the defendant sold $2.9 million in classic cars between 2024 and 2025 with the assistance of SURETY 1, and a witness has reported that SURETY 1 took possession of valuables, including jewelry, in anticipation of a federal search warrant on the defendant's residence in May 2024.  SURETY 1 is a surety on the bond; these newly discovered facts call into question whether SURETY 1 can exert sufficient moral suasion on the defendant to assure his appearance in Court.  The defendant and Stacy Mattson declined to answer Pretrial Services' financial questions; it is unclear to what extent SURETY 1 described the above transactions to Pretrial Services in her interview, and therefore to what extent Pretrial Services had the benefit of this information in recommending that SURETY 1 was an appropriate surety.  At the very least, the discovery of this new information strongly militates against the defendant's request to remove 210 LaSalle from the bond.

If the Court revisits the Magistrate Judge's bond conditions, it should make a *de novo* determination of whether conditions exist to adequately mitigate the defendant's risk of flight and his danger to the community, considering all of the information currently known to it, including that which came to light following the Magistrate Judge's determination.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny the defendant's "Motion to Modify Pre-Trial Asset Restraint" and deny his request for a hearing.

DATED:  July 9, 2025                                        Respectfully submitted,

                                                            CRAIG H. MISSAKIAN
                                                            United States Attorney


                                                            _____/s/_____
                                                            CHRISTOFFER LEE
                                                            NIKHIL BHAGAT
                                                            Assistant United States Attorneys